**Samuel AGUIRRE, Appellant**

v.

**The STATE of Texas.**

**No. PD–1064–12.**

Court of Criminal Appeals of Texas.

Jan. 16, 2013.

Rosa A. Eliades, Houston, TX, for Appellant.

Patricia R. Lykos, District Attorney Harris County, Houston, TX, Lisa C. McMinn, State's Attorney, Austin, TX, for State.

COCHRAN, J., filed an opinion concurring in the refusal of the petition in which JOHNSON, J., joined.

*"For want of a nail the shoe was lost."* [1] For want of a factual finding, the appeal was lost.

Appellant was charged with possession of almost 400 pounds of marijuana. He filed a motion to suppress alleging that a cadre of narcotics officers used "coercive tactics" in obtaining consent to search his home. After a hearing, the trial judge denied the motion. Appellant did not request findings of fact and conclusions of law, but, after accepting a plea bargain, he appealed the trial judge's pretrial ruling. The court of appeals found that the police did not exceed the scope of a valid "knock and talk," and therefore "the record supports the trial court's implied finding that Aguirre consented to the search of his home." [2] Appellant filed a petition for discretionary review with us, claiming that the court of appeals erred by concluding that the facts could support a finding that this police-citizen interaction was a mere "knock and talk" and that appellant voluntarily consented to the search. [3]

At the hearing, testimony showed that police had received a tip that appellant was involved in drug trafficking. At around 10:30 a.m. one Thursday morning in July, nine Houston police officers, five federal I.C.E. agents and some other officers—for a total of 17 to 20 officers, all in "plain clothes" and driving "plain cars"—went to appellant's neighborhood to conduct surveillance of his home and neighborhood. [4]

---

1. For want of a nail the shoe was lost.
   For want of a shoe the horse was lost.
   For want of a horse the rider was lost.
   For want of a rider the message was lost.
   For want of a message the battle was lost.
   For want of a battle the kingdom was lost.
   And all for the want of a horseshoe nail.
   Early 15th century nursery rhyme, possibly based on Richard III's death at Bosworth Field. *See* IONA & PETER OPIE, EDS., OXFORD DICTIONARY OF NURSERY RHYMES, at 324 (Oxford 1951).

2. *Aguirre v. State*, No. 01–11–00189–CR, 2012 WL 2922547, *3 (Tex.App.–Houston [1st Dist.] 2012) (not designated for publication).

3. Appellant's ground for review is as follows:

   The First Court of Appeals erred in finding that the police did not exceed the scope of a valid "knock and talk," where six uniformed and armed police officers approached Appellant's front door, informed Appellant they were conducting an investigation, had Appellant and all his family members exit the house, separated Appellant from his family, had him sit on the ground on [the] side of [the] house, and informed Appellant that an individual that the police had found in possession of one pound of marijuana that day told police that Appellant was his dealer, before asking for consent to search Appellant's house.

4. Officer Moreno testified that the cadre of undercover narcotics officers "set up like a magical box" so that the individual officers

Appellant was in the driveway washing his white Tahoe SUV. During the next several hours, various cars and people came and left. Officers followed them. Appellant was followed to the Wal–Mart and back home.[5] Around 2:20 p.m., officers saw a man walk out of appellant's garage with a white plastic bag. Some officers followed that man as he drove out of the cul-de-sac and, after stopping him for making an unsafe lane change, discovered that the bag contained one pound of marijuana. The man told police that he had purchased the marijuana from appellant earlier that day.

Rather than obtain a warrant, at least six of the narcotics officers, wearing jackets emblazoned with "AGENT" and carrying guns, approached appellant's residence to conduct a "knock and talk." Other officers "set up a perimeter" and secured the sides and back yard. Officer Moreno testified that the sole purpose of the visit was to obtain consent to search appellant's home.[6] It is here that the officers' and appellant's stories begin to diverge.

Officer Moreno testified that three officers knocked on appellant's front door; they could see appellant, along with his wife and children in the living room. Appellant came to the door and Officer Moreno testified, "I told them, come out, everybody. Said, who is inside, come outside."[7]

There were seven or eight police officers waiting for them outside. Officer Moreno said that he took appellant and his cousin to a wall around the side of the house away from the rest of the family members. He had appellant sit down in the yard and told him that the officers were investigating the marijuana that was seen coming from appellant's garage. When appellant did not respond, Officer Moreno asked him if the officers could search his house.

Once appellant said that he would consent to a search of his home, three or four officers took him back inside where Officer Moreno filled out a consent-to-search form and appellant signed it. Officer Moreno said that appellant wanted to tell his wife that he was consenting to have their home searched, so the officers allowed her to come back inside to talk to her husband. The officers, while armed, kept their weapons holstered throughout the entire visit.

Appellant's story is markedly different. He testified that, as he was coming out of the bathroom, his wife said that police were coming. Then three armed officers knocked "really loudly" on the front door. More police were at the back door and around the side of the house. Police opened the front door, grabbed appellant's cousin, and demanded that everyone get out of the house. "Many" officers came inside, and they told appellant to go out-

---

could split up into teams and follow anyone who left the targeted location.

5. Appellant went to the Wal–Mart with two other men in a blue Mercury. After those men dropped appellant back at his house, officers stopped the blue Mercury, "to enhance their investigation" and thinking that one of the men in that car might have authority to consent to the search of appellant's house. The officers used a drug dog to look for drugs in the Mercury, but nothing illegal was found, so the two men were brought back to appellant's neighborhood until the officers obtained appellant's consent.

6. Officer Moreno testified, "I believe I had enough probable cause for a search warrant, but I always try to get consent first from the individuals." Officer Moreno said that he was familiar with the process for obtaining a search warrant and that it was not difficult. He said that he had "no concerns" about getting one in this case if appellant did not consent to the search.

7. Appellant came outside with his wife and two young sons, as did his cousin, and the cousin's wife with appellant's infant son in her arms.

side. He felt that he had to follow their orders because "[t]hey all had guns in their hands." Appellant was separated from his family and told by police that they were investigating the marijuana which they had been told came from his home. Police then forced appellant to his knees by the side wall and "they took everything out of my pockets ... and they checked my wallet and everything." After the police checked to see if there was anyone else in the house, they brought appellant back inside, sat him down at the dining room table, and presented him with a Spanish-language consent form: "He told me that I had to sign it and, if not, he was going to take my wife and my children to jail, also." Appellant said that he signed the form because he was afraid that they would take his wife and their three children, ages twelve, ten, and three weeks, to jail. He asked for his wife so he could tell her that the officers had promised not to take them to jail if he let them search their home.

Appellant's twelve-year-old son, Sammy, also testified. He said that he and his father and appellant's cousin were all in the restroom watching his father try to put in a contact lens for the first time when he saw the shadow of a policeman go past the window. When Sammy came into the living room, he saw officers open the front door and about six of them came inside. "They had guns up." The guns were pointed up in the air and they grabbed the cousin's arm and took him outside and over to the neighbor's wall. "They told us, everyone, to get out of the house." Sammy said that they all obeyed. Sammy saw "a lot" of policemen outside. Sammy's younger brothers were both crying. He saw his father taken over to the neighbor's wall.

Appellant argued that this was no "knock and talk" because it involved almost twenty police officers who surrounded his house, ordered everyone outside, and separated the two men from their wives and children. Whether they displayed their guns as both appellant and his son testified, it was obvious that the officers made "a huge show of force."

> He says he signed it because he was afraid they were—they told him they were going to take his wife and kids to jail. Even if you believe that that was never said, this is an inherently coercive situation. You are taken out of your house, you are brought out and your wife and kids are outside. This is an inherently coercive situation. He is not *Mirandized....* As soon as they take him inside, as soon as he's detained, they have him sign the consent.

The prosecutor argued that, crediting Officer Moreno's testimony and viewing the totality of the circumstances in the light most favorable to his testimony, the trial judge could find that appellant voluntarily consented to the search of his home.

The trial judge denied appellant's motion to suppress without comment.

The evidence presented at the suppression hearing was clearly conflicting. However, appellant did not request the trial judge to make factual findings supporting his denial of the motion to suppress. That failure sealed appellant's fate on appeal.

In *State v. Cullen*[8] we held that the trial judge must provide explicit factual findings supporting the denial of a suppression motion when the losing party requests such

---

8. 195 S.W.3d 696, 700 (Tex.Crim.App.2006) ("Because an appellate court's review of a trial court's ruling is restricted by an inadequate record of the basis for the trial court's ruling, we find it necessary to require a trial court to express its findings of fact and conclusions of law when requested by the losing party.").

findings. The reason for this is clear: in the absence of specific findings, an appellate court's hands are tied, giving it little choice but to "view the evidence in the light most favorable to the trial court's ruling and assume that the trial court made implicit findings of fact that support its ruling as long as those findings are supported by the record."[9] Factual findings can only help the losing party on appeal.

Appellant asked the court of appeals to review the trial judge's decision to deny his motion to suppress. But without specific findings, an appellate court has no way of knowing what the basis for the denial of the motion was, or if it was appropriate. Absent specific factual findings, we can only conclude that the trial court made "implicit findings of fact" that support his ruling.[10]

I have a difficult time hypothesizing sufficient facts from the testimony in this case—even crediting every word of the State's two witnesses and discounting every word uttered by appellant and his son—that would support a finding that this was just a "knock and talk" citizen-police encounter.[11] I find it even more puzzling that the trial judge could have found, by clear and convincing evidence, that appellant voluntarily consented to the search of his home, based upon Officer Moreno's testimony. Had I been in appellant's position, I would not have felt free to ignore the demands (or requests) of this cadre of narcotics officers. I think it unlikely that *any* normal reasonable person in appellant's position would feel free to ignore these police officers under the circumstances to which Officer Moreno testified.[12] To me, this is a real stretch by both the trial judge and the court of appeals. I cannot imagine that those judges would have felt free to ignore these officers and their demands/requests had they suddenly arrived at their homes. On the other hand, it is within the realm of possibility (though just barely) that the trial judge

---

9. *State v. Ross*, 32 S.W.3d 853, 855–56 (Tex. Crim.App.2000).

10. *Id.*

11. We have explained that in a consensual citizen-police encounter, such as a "knock and talk,"

> Police officers are as free as any other citizen to knock on someone's door and ask to talk with them, to approach citizens on the street or in their cars and to ask for information or their cooperation. Police officers may be as aggressive as the pushy Fuller-brush man at the front door, the insistent panhandler on the street, or the grimacing street-corner car-window squeegee man. All of these social interactions may involve embarrassment and inconvenience, but they do not involve official coercion. It is only when the police officer "engages in conduct which a reasonable man would view as threatening or offensive even if performed by another private citizen," does such an encounter become a seizure.

*State v. Garcia–Cantu*, 253 S.W.3d 236, 243 (Tex.Crim.App.2008).

12. There is no dispute that Office Moreno ordered everyone out of the house, and no dispute that he separated appellant and his cousin from their families, taking the two men around the side of the house and having them sit on the ground while he asked for consent to search appellant's house after he had already informed appellant that the cadre of officers had seen someone taking a bag of marijuana out of the garage. These facts indicate to me that Officer Moreno was exercising official authority and that compliance was required, not optional. *See Garcia–Cantu*, 253 S.W.3d at 243 ("It is the display of official authority and the implication that this authority cannot be ignored, avoided, or terminated, that results in a Fourth Amendment seizure. At bottom, the issue is whether the surroundings and the words or actions of the officer and his associates communicate the message of 'We Who Must Be Obeyed.'").

could have found, based on Officer Moreno's testimony, that appellant voluntarily consented to the search even though he had been detained by the officers. Such a factual finding might pass the "red face test" [13] if phrased very carefully. Unfortunately for appellant, with no explicit factual findings it is almost impossible for him to overcome the extremely deferential standard of review that we use for the trial judge's implicit factual findings.[14]

With these comments, I reluctantly agree with the Court's decision to refuse appellant's petition for discretionary review.

---

**13.** A plausible answer is one that passes the "red face" test; that is, one must be able to answer the question responsibly without one's face turning red or blushing with embarrassment. *See http://en.wiktionary.org/wiki/red_face_test.*

**14.** *See State v. Ross*, 32 S.W.3d 853, 855–56 (Tex.Crim.App.2000) (when trial judge makes no explicit factual findings, the appellate court will imply the necessary facts that would support the trial judge's ruling if the evidence would support those implied factual findings).